Page 2802 is section A of the modification, which makes clear that this is a contract modification and the contracted issue is the F-22 contract. If you look in the upper left-hand corner, it's the contract number, the 91 means it's the... Would you take a different position in this case if everything were the same except the word novation was written at the top of the modification and the parties said, well, we're accepting all the provisions of the contract except those that are being changed and we are executing a novation of the contract? Well, yes, of course, because that would be what the government and Lockheed agreed to. And in fact, if you look at page... You think the government did not agree in this case to the notion that a different cost accounting system would be employed and that the costs of that new cost accounting system would be added to the contract. The government did not agree to that? That's absolutely true. And if you turn to page 2840 of the appendix, which is the special contract clause H-150, which we cited at page 12 of our initial brief and to which Lockheed did not respond. And in fact, we cited this to the board and the board said nothing about it. What does 2840 demonstrate? 2840, yes, sir. I'm looking at it. It says, award of this contract does not constitute a determination that the contractors disclosed and applied accounting practices used in pricing this contract. Where are you on the page? Oh, pardon me, H-150. It's about a third of the way down. And it states that award of this contract does not constitute a determination that the are in compliance with the cost accounting standards. The government retains its right to adjust the contract estimated cost plus applicable base or fixed fee under the CAS clauses of this contract if a subsequent final determination of noncompliance. Is this the original F-22? No, this is the modification. In fact, this is where in November of 1993, after Lockheed unilaterally decided that the F-22 contract was no longer subject to CAS requirements. This was a clause that Lockheed Martin agreed to. If you look at the lower left-hand corner of the cover page of the modification, there's a signature from Lockheed Martin. But how is that inconsistent with the idea of a novation? Well, if it were a novation, the parties were freely able to make a cardinal change to novate the contract if they had wanted to. They could have terminated the existing F-22 contract and entered into a new contract. However, that was something that the parties did not agree to. This was instead a modification. In fact, it was only one of 98 modifications. One of the things that seems to be a theme of your argument and you asserted in your brief is that, in effect, the government was not told of what the effect of this change in accounting system would be. Right. That's absolutely true. Well, how about a couple of things? First of all, at 2688-89, this is documented in August of 93, there's a specific reference to the increase that results from the new direct costs for program management of $71,193,000 which had been balanced off against the decrease in cost associated with the union contract for a net decrease in cost of about $8 million. But that lays it out pretty clearly, it seems to me. And then also, if you look at the board's opinion at, I think it's A-7 if I recall correctly, this is in July, A-7 to A-8, it looks to me like they lay out the $71 million very clearly as associated with the change from indirect to direct cost. Why isn't that full disclosure to the government of what's going on? Well, first of all, it didn't follow the regulations as required. The only time that Lockheed attempted to follow the regulations as written was in December. Stay with my question. Why isn't that disclosure of what you're complaining was not disclosed to the government? Well, the Cass statute mandates that the government not pay increased costs in the aggregate. And that's very important language here because the government had no idea of what the effects would be over all of Lockheed's other contracts. In fact, and that's the genesis of the $14.7 million number at issue in this case, Lockheed's free to change its accounting standards and the price, the cost of one contract could go up $10 million, the cost of another contract goes down by $10 million, then it's a wash and there's no recovery by the government. However, in this case, all we knew was that for some of the period of the F-22 contract, the costs would go up. We had no idea of any offsets from other contracts. And the other contracts at issue, as we noted in page 2647- As we heard out, you benefited from, the government benefited from those onsets. Well, no. In the end, the government did not benefit. There was a total without the F-22 contract of about a $1.5 million difference, which was not subject to this action. But the other contracts included- Oh, Lockheed paid what some, I don't have the exact number, paid you back a certain amount of money. That was, well, this was for a number of different accounting changes. We're talking about a single accounting change that occurred in mid-1993, but you need to remember that at the time, Lockheed had merged with Martin Marietta, it was also, had acquired other defense contractors- Are you saying that the amount that Lockheed paid you in settlement and those other things were different accounting changes than the ones that were involved in the F-22? I believe they were different accounting changes that occurred later on, the 94 and 95 changes. There might be some element of it that was from the 1993 changes, but the 19- I'm not certain I get your non-disclosure argument, Ben, because with regard to the accounting changes that are at stake in the F-22, I think Judge Bryson pointed out what looked like pretty full disclosure. Well, first of all, it's not- The argument was, well, that's disclosure, maybe adequate disclosure as to the F-22 and the direct indirect cost issue, but it's not disclosure as to these other things. But if the other things were different accounting changes, it doesn't seem to me that- Are you arguing that there wasn't sufficient disclosure of the other accounting changes in the other contracts? At the time, Lockheed had other contracts and there was not full disclosure of the aggregate increase in costs to the United States. In addition to being only partial disclosure over a certain number of years and not over the entire life of the contract as required, there was not full disclosure of what the cost would be in the aggregate. It wasn't until December of 1993 that Lockheed provided that disclosure absent the F-22 contract. And there were a number of other contracts that were at issue. There was the P-3 anti-submarine warfare aircraft. There were C-130, C-5, 141 transports, and there was a Navy advanced attack tactical fighter program. I didn't understand the argument in your brief to be predicated on effects coming from other contracts. I thought you was talking about the failure to disclose the effects from the conversion from indirect to direct costs as affecting the costs in this contract. I'm looking at page 30 of your brief where you make this argument. Are you changing that argument now? Where was the reference in your brief to any of these other contracts? Because I didn't see it. Well, we talked about the aggregate. We did cite to A-2647 where we talked about the need for disclosure in the aggregate and that the CAST statute requires disclosure in the aggregate and that the ACO... The aggregate of what? The aggregate of all the costs associated with this contract or... Of all contracts. All the business... All right. Where do you make that argument in your brief? We make that argument where we discuss... Which page? I can... Because it's not going to help me if you just characterize it generically. Where we discuss the testimony of the various personnel before the board. We talk about how they were waiting for an aggregate price disclosure, which I am now looking for. Well, maybe you can get to that on your buttle and maybe your colleague can help you find the page if that works for you. I don't want to use up your time on that. Yes, sir. But most importantly, returning to A-2840, it's very clear that the government reserved its right to make this adjustment, the very adjustment that it made. And that's something that Lockheed Martin signed on to in the contract, yet at the same time it unilaterally decided... Well, that kind of clause is just saying we are not hereby forfeiting whatever rights we might have. That doesn't mean that they have rights. I mean, they're just saying this doesn't count as our giving up any rights that we may have. But if you, in fact, don't have any rights, then that clause doesn't give them to you. So you have to find a source of rights somewhere else. A full novation would neuter the effect of that clause. I mean, if the parties had actually sat down and said, let's tear up the F-22 contract in its entirety, we're going to write a brand new contract, stem to stern, and they had done that, then the clause at A-2840 wouldn't have any operability. That's absolutely true. And, in fact, the parties could have done that, Lockheed Martin... That's what you're stuck with, with the fact findings in the case, I think, of the board saying they are treating the, with a used word, very substantial, significantly substantial reworking of the contract, and they're treating it in essence as an elevation. Well, in that case, the board made a very, very clear legal error by relying upon secondary sources, in fact, Lockheed Martin's own intent or a statement in a memorandum five years after the fact. How about a statement in the memorandum? Isn't that an admission by your client? And I'm talking about, of course, and I think you are too, the May 18th, 1999 statement by the Department of the Air Force, your client, which says the intent was to reprice the entire F-22 contract. Isn't that essentially an admission of the proposition that you're resisting? Well, that's, well, first of all, that's absolutely irrelevant because it's secondary information trying to glean the intent of the contracting parties when no ambiguity has been found in the actual contract itself. Looks like an admission of a party to the dispute. We believe it is the contract itself is what governs, and there's no ambiguity in the contract. Do you have an explanation for this language that would, other than simply to disclaim it? Well, you go past into the next few sentences where it talks about repricing in the context of all of the buckets that were at issue. There were five separate buckets, one in accounting for overruns already incurred by Lockheed Martin during the first 18 months of contract performance. That's over $600 million, an estimate of future overruns. The third bucket was a cost to reduce aircraft weight. What about the second bucket? And then there were cost savings from reduction of aircraft from 13 to 11 and costs attributable to the refit. What about the second bucket? The second bucket being revised program baseline. That's correct. You're revising the dates for which performance would occur. Those were changes in the schedule. That was not a change to the F-22 contract itself. It was not a novation. It was simply a different delivery schedule for the 11 planes. If you look at A-2803... And a different number of planes, I take it. They reduced the number of planes by two? Correct. And what exactly in the modification itself would somehow create an entirely new contract? If you look at A-2803, it lists all the contract modifications leading up to Modification 98. Each one of those... Does each one of those reprice the entire contract? Well, there are new costs associated with the contract. In fact... Can I come back to the question that Bryson asked you about, we're talking about the universe of all these contracts. I saw a footprint of that argument in your brief at page 13. Because at page 13, you're talking about Lockheed got a 60-day extension and submitted its proposal. The proposal reported mid-year changes with an overall decrease of a million and nine. My understanding was that that was the universe of all their contracts, page 13. Maybe I'm wrong about that. They saw their cost changes across the universe of their contracts. They thought there was going to be a decrease. And see, it cast covered contracts in the plural. But whether or not that is what you were talking about where you thought you raised the point in the brief, can you assure me that the cost accounting changes in the other contracts other than the F-22 were different cost changes than the essential indirect direct cost that drove the F-22 cost change? No, there were... The indirect direct cost changes that drove the F-22 changes were also involved in all of the other contracts. But in the later recoveries, Lockheed had further accounting changes in the future. In 94 and 95 when Lockheed merged with Martin Marietta when it acquired, I believe, part of Grumman Aerospace. And there was a number of other accounting changes. And so the 1998 audit looked at everything. Let's say... Well, we've run through your time, but we'll reserve your full rebuttal time to Applebee's. Mr. Albertson? May I please have a quote? The issue in this case is really quite simple. The issue is whether the F-22 contract was affected by the accounting change and therefore the government has a right to a price adjustment on that contract as a result of these accounting changes. In our view... Let me ask you a question, since you put it that way. Was the cost to the government of the performance of the F-22 contract increased or decreased by the accounting changes? The cost on the F-22 contract was increased after the accounting change. It was more than it would have been if the accounting change had not occurred. Right. And so if you look at the language of the FAR about if the contract price or cost allowance is affected, why wouldn't the price be affected if the price is increased? It would have been. And this is an important... The factual sequence of what happened here is really important. And the definition of what is affected. Now, there wasn't a definition in the regulation, as we all know, at the time this contract was awarded. There is now. And I think everybody seems to agree that the 2005 definition has to be interpreted as applicable at the time of this. I don't think the government has... I haven't seen any argument to the contrary in the government's brief. I agree with that. And I guess that as well. No, I agree. The government keeps saying, well, it wasn't there then. But I believe below, the government basically conceded that this is... And they don't seem to be arguing that that standard should not apply here. Yes, sir. Okay. So we're on common ground. And what does that definition say? It says that there is an affected contract if at the time of the estimate that was used to price the contract, the contractor used one method of accounting. And then in actually keeping its books during performance of the contract, it uses a different method of accounting. And as we pointed out in our brief... Well, and then the real question is whether or not where they're saying you use one accounting practice to estimate cost, is that the initial estimation or a subsequent estimation later on? And I think that's where the issue is in this case, Your Honor. Now, is that a matter of question of law for me to construe whether I should put the word initially in front of the words to estimate? I think it's more a factual issue than a legal issue. I think the question of what affected means is a legal issue. That's a definitional issue that is a classic legal issue. Let me ask you this question. Let's assume for purposes of argument that a contractor sits down with the government and the contractor uses certain cost accounting conventions to come up with the cost that they're going to use in the contract. And the government then accepts the contract based on that. And performance goes along. And the contractor comes along and says, I would like to change my cost accounting on one aspect of the contract. One aspect of the contract. And here's why I would like to do it. And it's going to have an impact on the contract. I think it's going to increase the cost of the contract. But I think it makes sense. It's the right thing to do. And the government says, okay, it looks good to us. And they sign a mock. Is that an affected contract? Yes. In all likelihood. That's where I think we get to the second issue. I want to hang on to you there. Because what I'm trying to take is just one piece out of a contract where the initial cost estimates that build up the price that the government agreed to in the contract get changed. And they get changed mutually. And my hypothetical wouldn't really change in my mind whether it was the government asking for the change or the contractor asking for the change. If you look at what the CAS board said about the purpose of these provisions in our initial brief, the CAS board said, look, what we're worried about here is the contractor changing unilaterally the way it accounts for cost in a way that damages. That's what I'm trying to get at. But in my hypothetical, I said that the government agreed to the change so it was mutual. You nonetheless said it would be an affected contract. And the way the process actually works, the government doesn't get an opportunity to agree or disagree. The contractor, as a matter of right, may change its accounting practice. The government, as a matter of right, when the contractor does that unilaterally, is entitled to an adjustment in the price if the costs are increased. In this case, and that's why the facts are so important, our argument is the government renegotiated the price of this contract after the change was made, knowing the impact. Right. The notion is the CAS stands to protect against a voluntary change by a contractor who just wants to make a change. And if it has a good effect for the government, they're happy. They're not going to complain. But if it has a bad effect, you can't get away with it. It seems to me you're sort of taking that voluntary concept and saying, well, in our And that that sort of just takes you, lifts you out of the CAS concerns altogether. That was our second argument that the board never got to because it decided on the first argument that this was not an affected contract. I think what the board effectively decided here is what the panel was asking Mr. Tocini about innovations. What the board essentially decided is that this contract was renegotiated. The baseline that the government agreed to pay on this contract was renegotiated to include the increased cost. But if that was the case, why wasn't it characterized as such and instead characterized as a modification? Because technically it was a modification to the contract. And the way the process actually worked is that the parties sat down and went through the entire statement of work every hour that was estimated for every task under the contract and negotiated a price. And then they took that new negotiated price and they went back and sort of backed into the modification that they wanted to make to the contract. The alternative would have been to terminate the contract for convenience on some no-cost basis and negotiate a new contract with a new contract number. That is effectively what they did. But the mechanism they used to do it, because administratively it was easier, was to negotiate a new price and then agree to modifications to the existing contract that were the difference between the new price and the original contract price, essentially backing into those numbers. Did the modification affect all aspects and all items in the contract? No, sir. I mean, for one thing, there were a couple of... But there wasn't a renegotiation across the board. There was a renegotiation across the board. Some discrete items, the testimony at the hearing was, and we agree, there were some discrete items that didn't change at all. There was no change in the work. There was no change in the estimate. There might have been changes because the numbers are different. The rates are different, the hourly rates, the overhead rates, but basically the contract was... For those items, did the change in accounting practices have an effect on cost? It could have for some of them, because for almost all of them it would have. As Mr. Tosini said, the effect of this change was not to change the overall cost  but it was to take costs that had been treated as overhead costs by Lockheed and make them direct costs. It converted from indirect to direct. Exactly. And added thereby some amount of cost directly bearing on the contract but presumably reducing costs that were going to be associated with all the contracts. Exactly, sir. And that's what is important, and I think Mr. Tosini was wrong about what he said about the facts. The overhead rates came down because of this change. You would expect so. The direct cost went up. On some contracts, the effect of that reduction in overhead was actually to save money on that contract. On the F-22 contract, the direct cost, we agree, went up more than the overhead rates went down. The $17 million that Lockheed paid to the government as a result of the final decision in this case is not only about 93 changes. That's true. There were other changes that were settled in that $17 million. But it includes the favorable impact to Lockheed Martin that resulted from those changes on contracts other than the F-22 contract. That wasn't an issue at the board. We never tried to break out how much of that change was related to the 93 changes at the hearing below. But that $17 million includes the adjustments that the government was entitled to on all the contracts other than the F-22. And Lockheed's position in 1993, when it submitted its detailed cost impact statement in December of 1993, shortly after this negotiation was over, Lockheed submitted a detailed cost impact statement. And on the cover sheet of the cover letter for that statement, it said we've excluded F-22 because it wasn't affected by these changes. Now, do you understand, and I'm going back to the questions and the exchange I had with Mr. Ticini earlier about the nature of the disclosure that was made in 93, July and August of 93, about the numbers. Do you understand both the two-page excerpt from the board's opinion that has the $71 million number identified as being associated with the conversion from indirect to direct costs and also the two-page item that comes from August that we were talking about? Do you understand that to be a full disclosure of the cost effect of the change in the accounting system or less than a full disclosure? This is an iterative process, Your Honor. Lockheed submitted a proposal to the government that had some detail in it. Then there were months of negotiation between the parties where there was a whole lot of additional detail. The testimony at the hearing was that when Lockheed had to deliver this proposal for the renegotiation of this price to the Air Force, they had to rent trucks to take the proposal to Dayton from Marietta because it was so big. The negotiations went on for months. There was testimony quoted by the board, cited by the board, relied on by the board, that the two negotiators, principal negotiators for the party, were in Marietta, and they actually walked down the hall and counted the number of people who were indirect in the original accounting method going to be direct in the new accounting method, estimated the number of hours associated with those specific people, got travel estimates for those specific people who were now going to be direct instead of overhead, and all of that was incorporated into the contract price. In that original proposal in June, was that a full proposal? Was that full disclosure? No, we have never said it was. But over the course of this negotiation, and the notion is you don't make full disclosure of everything all at one time. You give the government a proposal. Then there's all this supporting data that is used to negotiate, and at the end of the day, we have what the Air Force said in 1999, which is we understood exactly what was in this proposal. We understood the impact of the change, and we intended to incorporate it into the new contract price. So what is the document? What is the nature in this sequence of events that you've laid out for us of working the way towards a final proposal? The document from July 29th, I think it is, 1993, what does that represent? When some very specific numbers are laid out, we're going to save, I think it was 79 million on labor. Labor we're going to cost you, it's going to cost you an extra 71 million for the conversion from indirect to direct. What does that constitute in your view? It was a fact that was disclosed, and a true fact that was disclosed during the negotiation. That's an estimate? Would you call that the estimate based on the new accounting system? Well, the first estimate that they gave the government was when they announced that the change was going to be made. At that point, the F-22 contract was an affected contract because it hadn't been repriced. In that first estimate, they told the government the impact of this accounting change on the F-22 was going to be to increase the cost by over $10 million. That was in the first disclosure in June. Then in July, there's another disclosure where Lockheed says, well, now we've negotiated a new deal with the union, and if you take the union deal and put it together with what we've already told you about the increase in cost, you're going to come out ahead in this renegotiation. But then what really happens that's important is we have all the negotiations, the board heard five days of factual testimony about these negotiations and concluded what it concluded at the end of that testimony about what had happened in the negotiation. Just time-wise, these negotiations are taking place after the 29th of July 1993? Yes, sir. Through the late summer and early fall of 1993. And does the board's opinion reflect its conclusion about those negotiations? Yes, sir. Where in the board's opinion? Well, that was the record that was before the board was about,  They talk about September 24th of September. You requested an extension, and then something else happened in October. But this was a complicated negotiation, obviously. It was a $10 billion contract. The price was being renegotiated. And the first- To cut to the chase, I mean, your argument, your response to Judge Bryson is that the document to which he pointed, which was the July 29, 1993 document, is not the epitome of a complete disclosure. It's a piece of a process. And it was a rolling disclosure that went on over a period of time. What the regulation requires is- Let me ask you, could you look at your brief, please? Yes, sir. Page 9 in your brief. 9 in your brief. It's right above the last paragraph. There's a string cite in there supposing the proposition that the impact of the changes were fully disclosed. Yes, sir. And I looked at most of those, and they seem to be a rolling dates running across. Yes, sir. That's exactly right. If I were to look at those, that's your support for the position you're taking here now. Yes, sir. If you look over at page 22 of your brief, you'll find that you're making a different point. That is to say, you're saying the board found, as a matter of fact, that both parties understood and intended to reprice the entire contract. Now, the authority you're citing, there is exactly the same authority you cited for the disclosure. I looked at that, and if you've got- Do you have your record with you? Yes, sir. Just to pick one of them. Look at A1711. And it may be sort of that I'm not as experienced in this field as you are, but show me on page 1711 where there is evidence that it was the intent of the parties to reprice the entire contract. Because it's showing the total overhead rate impact on the entire contract. Where is it showing that? Total overhead impact. Toward the bottom, there's a $52, $53 million number. This was a point that I wanted to- How do I know that that's impacting the whole contract? As opposed to impacting a piece of the contract. I guess we're relying on the fact that it says total overhead rate impact. Which, in that string site, you know the records are in that string site. Which, on page 822, which is the same, what's the strongest piece of evidence in there showing the intent to reprice the entire contract? I think the strongest piece of evidence is the Air Force memo in 1999. I'm not sure. I'll have to look at which one of those But that says it was our intent to reprice the entire contract. That's 2897. Yes. Now maybe, did we cite that there? Yes, you did. Yes, OK. I think that is, to us, that was the most important document in this case. Because it said clearly, and the testimony at the hearing was that the principal negotiator for the government wrote that response to the DCAA questions. What they meant then by reprice the entire contract was not to go in and pick every single price item and change every single price item. It was to make a substantial enough dent in all the prices so that when you look back through a glass darkly at the contract, they said we intend to reprice it. Yes, sir. And the testimony at the hearing was they went through and re-examined everything that they'd agreed on in the original negotiation. Nothing was closed to being adjusted. In some cases, they concluded there's nothing to change. Was there testimony to that effect? Yes, sir. I'm not sure I have a citation right now. But that was the testimony at the board. We looked at everything. I got the record. Be honest with me. Did you try the case? Yes, sir. Now you're telling me you put on a witness that said, or you got it out of the government's witness that the intent was to look at all, nothing was withheld. You're looking at all of the items were up for grabs. I believe that's what the board found as a matter of fact. I haven't seen that fact finding. It's in the reference. Where's the reference to the work breakdown structure? I didn't see anything where the board was saying that at the time that F-22 was being re-looked, the book was entirely open. Every single page was available for a change. Well, page A-16 is probably the area of the board's opinion that comes closest to what you're. I'm looking at the paragraph that begins first. We agree with the appellant that negotiates. I don't know whether it goes as far as your characterization of it, but that seems to be where the board is focusing in on this precise question. You see the paragraph I'm talking about on A-16? I was looking back at the factual findings, Your Honor. There may be something. I didn't see anything in the factual findings. The next sentence also. The Air Force, as well as appellant, described the scope of this effort as a repricing of the F-22 contract. Yes, sir. Comprehensive. Now, of course, Mr. Ticino's answer is, well, yeah, that's the way the Air Force described it, but that's just secondary information. There were five days of testimony, and the board, based on five days of testimony from both government and contractor witnesses, found that there was a comprehensive repricing of this contract that it was at a WBS3 level. That means a very low level in the contractor's accounting system. Am I to assume that with regard to the other Lockheed Martin contracts that were in the pool for purposes of making the CAS universe call, that the relationship between the contractor and the government in those cases was different than it was in this case? They were not repriced from bottom up? No, no, they were not, sir. In fact, most of those other contracts were fixed price contracts, not cost reimbursement contracts. And what actually happened is the cost went down on those contracts. Now, they were fixed price, so the government would have paid a higher price than it would have if it had known of the accounting change when it priced the contract. The way these rules work, the government gets that money back on those fixed price contracts. So on the fixed price contracts where the costs were reduced, the government got its money back. Would the cost be reduced because the indirect costs allocable to those contracts were reduced and the whatever direct costs that were suddenly loaded onto those contracts were less than the change in the indirect cost? Yes, sir. And that's exactly the same thing happened on the F-22 contract, only the flip side. The indirect costs all went down. The government got the benefit of those reduced indirect costs. It's in the contract price. The increased direct costs are also in the contract price. Just generically speaking, and here I'm way beyond my pay grade. But generically speaking, when you convert from, when you make changes in the allocation of indirect versus direct costs, in theory, across the contractor's entire business, it ought to be a wash, isn't it? Yes, sir. So it may be that there's an increase to a particular contract, but there's going to be, you would assume, a corresponding decrease somewhere else in the system. Now, it gets complicated, I guess, if the contractor is doing business not just with the Department of Defense but with somebody else. But I suppose General Motors doesn't buy a lot of fighter jets. The problem here, to be quite honest, Your Honor, is that there was some commercial work in this. Commercial in the sense that it was not sales to the government of the United States. Commercializing sales to the government of Saudi Arabia. Maybe not that one. To the government of the United Kingdom. Right, I understood. I understood. But in other words, that that's, OK, so that complicates the matter. And so some of the benefit of these changes was on that commercial work. I forgot about that form of commercial. But that's all part of the process. That's in the $17 million number. The government got what it was entitled to on all those other contracts. The parties stipulated to that at the board. That's the first appeal that was dismissed in this case was because the parties had not agreed on the impact on the other contracts. That was stipulated to, and then the board entered its judgment that said 14.7 is for the F-22 only. I noticed that in the briefing, no one cites a case to us in which something similar to this seems to have happened in the past. I think there is none, Your Honor. I'm sure there is none. Well, we have to assume that CAS has been enforced regularly over the years, that contractors have voluntarily made cost accounting changes while a contract was being performed, tried to stick the government with a bigger number, and got caught and couldn't do it, and they may have been litigated. What I'm trying to get at is, is this really a sui generis type situation where you have a contract of the size of the F-22 and you have a roll up your sleeves and let's, in media's race, decide that everything is up for grabs? My personal view would be that this is unusual but not unheard of. It's unusual because of the size of this contract. It's unusual because of the sequence of events we have here. The Air Force first saying, change your accounting practice. Lockheed saying, we're not going to change our accounting practice because if we do, you won't pay us. The Air Force then saying, we're going to reprice the contract. Lockheed saying, well, now if we're going to reprice the contract, we can put the changes into the repriced contract and we'll agree to do it and it'll be OK. The contracting officers knowing what they were negotiating, knowing what the increases were, this is a sort of unusual situation. But I couldn't tell you it's never going to happen. I suppose that you could have asked, you probably would have been told no, to have that provision that Mr. Ticini relied on at the outset struck from the contract. I wanted to address that provision, Your Honor. If you read that provision, it isn't about this issue. That provision is about a TAS non-compliance. It is about the contractor not following the cost accounting standards requirements. And it says that the government reserves its right to an adjustment. The contracting officer specifically found these practices were compliant with the requirements of the cost accounting standards and therefore could be implemented as a change. There isn't any issue here about a TAS non-compliance. The question here is, how much adjustment is the government entitled to? I don't know that that really fits. If this is part of the mod, this isn't part of the original contract. So it's saying, a word of this mod, the F-22 changes, doesn't constitute a determination that the disclosed accounting practices used in pricing this mod are in compliance. That's right. And it doesn't. If the government comes in tomorrow and says, the way you're allocating your overhead cost to this contract is not compliant with TAS, the fact that the government agreed today to price it based on those rates, and then they find tomorrow that it's not compliant with TAS, they've reserved their right to say this is not compliant. That's why the government's here. But this isn't about a non-compliance. There's no argument that these practices that we're talking about were non-compliant with TAS. In fact, the Air Force told Lockheed they were better practices. You should adopt them. These practices are compliant with TAS. The only issue is the amount of the adjustment that the government is entitled to because of the changes, not because of a non-compliance. Now, the clause we're talking about, the provision in the CAS that we're talking about refers to a voluntary change. Now, I'm a little unclear as to when there would be an involuntary change. You could argue. You don't argue. But I suppose one could argue that this really was not entirely voluntary since it was the strongly voiced preference of the Air Force to change the accounting standards. The term of art in the regulation is actually required. Is it required? It's not voluntary? They're required changes, voluntary changes, and desirable changes. OK. Voluntary, required changes are defined as being changes that are required by a change in the regulation that the CAS Board makes. I see. So that's clearly off the table. That's clearly not at issue here. Anything that is not required under the regulation is defined as voluntary. Even if they hold the gun to your head? Yes. Contractors have complained about that, as you might imagine, but that is what the regulation says. So the government, right, OK. And then there is the provision about desirable, which is sort of like involuntary, only not quite. There is this provision that says, if the change you make is good, and the government finds that it's desirable, then we'll treat it as a change that is like a required change, and you don't have to give us money back for it. But you're not arguing that this case is coming to that category. Yes, sir, we are. At the board, we did argue that this. But you're not here. We're not here, no, sir, because the board didn't reach that decision. They gave some guidance about how they would approach the analysis, but they didn't make. So even if you agree the government's right about the argument they're making here, which I obviously hope you don't. Sure would have made our lives easier if they had decided that this was a desired change, and therefore, a required change, and therefore, end of case. Yes, sir. But we'd still have that issue to decide at the Board of Contract Appeals in any case. If we reverse. If we reverse, yes, sir. Very well. Well, we've taken you well over your time. Thank you, Mr. Albertson. And we'll give Mr. Cassini some extra time as well to compensate for the parity in time. Why don't we, Mr. Cassini, I don't know how much you'll need, but if you need five minutes, we'll give you that much. And if it turns out that we need to go a little longer than that, we will. Thank you. First, I wanted to address your question about pages in the brief where we discussed the aggregate amount. If you look at pages 17 through 19 of our reply brief, we discuss the need for disclosure of cost effects in the aggregate over all contracts. And that's why the ACO, who's responsible for cash administration, was unable to make any determination as to whether Lockheed's changes were permissible. While at the same time, there's nothing about this in your opening brief, I take it? No, because we were responding to plaintiff's brief in our reply. And likewise, as opposed to plaintiff's factual characterization, the Truth in Negotiating Act required the ACO to use Lockheed Martin's most recent forward pricing disclosure, even before a CAS compliance determination had been made. Second, I want to talk about the issue of CAS violations. It's a violation to not pay an adjustment when you're changing accounting practices increases costs to the government. I mean, you read the CAS clause, and that's what it says. No increased costs shall be paid. And the CAS statute is just as definitive on that point. The government shall not pay any increased costs that are simply an artifact of an accounting change. And that's something that Congress was very serious about protecting the taxpayers from. And in fact, the whole CDA remedy was created in order to resolve disputes over exactly that issue. Third, I want to return to the modification itself. Page 2818, there's another section. Lockheed had argued, and although the board found that it was an unusually comprehensive change to the contract, never found that there was a novation, never made any sort of factual finding along those lines. And paragraph three of page 2818 makes clear that all other terms and conditions of the contract remain the same. So this is still the same F-22 contract. And the following paragraph. That would be true if you had a contract that everything was changed except the names and addresses of the parties. And you could have such a clause in there. That doesn't tell us very much about whether this contract was effectively completely repriced. Well, the contract itself, the four corners of the document, are what need to govern. These are sophisticated contractors. Lockheed Martin is the country's largest defense contractor. It's able to ask for a novation of a contract if that's what it wanted. Likewise, paragraph four. There is no fact finding by the board that every single provision in the contract was changed. That's true. The board is treating this as there was a substantial enough change to treat the contract as if we can fit it into the definition of an effective contract. That's what the board did. But that is very misguided because there's no standard to apply. What's substantial? What is unusually comprehensive? We deal with that every day. It's five days of testimony. And it's the truckloads of documents that went from Marietta up to Ohio. And it's the going down the hall and looking at every single person whose costs associated with them will go from indirect to direct. But those sorts of things are issues that really are irrelevant when you look at the mod itself. In fact, paragraph four on that same page, 2818, is an integration clause. So any sort of statements about the party's intent after the fact should be obviated by the integration clause itself. And just as importantly, there were a number. If you go to 2803 and 2804, it identifies all of the contract changes and the amounts that were at issue. And what's to say that any one of these also weren't comprehensive? You can't counter. You don't counter the fact findings by the board about the substantiality of the changes, right? No, we don't counter. It was a comprehensive change, whatever that means. But the court here deals with questions. Unusually comprehensive. Yes, and the court here. And it was described by your client as a repricing of the contract. But if you turn to that page, which is 2897, the repricing of the contract was in the context of Lockheed's already incurred cost overruns, future anticipated cost overruns, plus the three other changes to the conditions of the contract. The weight of the aircraft, the number of aircraft, and the deadlines for performance. That, in and of itself, doesn't create an entirely new contract. It doesn't create an admission that the entire contract was changed. I don't think anybody's arguing there was an entirely new contract. Well, Lockheed Martin was making that argument here. The board made a much lesser finding and hedged its bets by saying. But we're reviewing not Lockheed Martin free. Yes. And it's assertions that it would be favorable to it. We're dealing with the reality of what the board had in front of it. Correct. And the board and the board. An unusual situation in which the party sat down and said, well, how big is the contract? It's like the health care bill. It's this high. And they said, let's just start at page one. You want to change page one? No, we'll leave page one there. We've got to change page two. Then jump to page 80. So the parties were rolling up their sleeves. That's the way it's being presented to us by your adversary. And I don't hear you telling us that that's not the record. And so the party sat down and flipped through page by page. We want to change this one. Let's go have a negotiation. And they came up with what they described as a repriced contract, top to bottom. For example, the pieces of the contract they didn't change were, in fact, repriced to remain the same that they were looked at. If your adversary is correct, I now get it. They sat down and just said, let's just start at page one. We'll go right through the whole thing. And so if you took page one and said no change, that was renegotiated. That is to say it was reaffirmed. Well, that can be said about any comprehensive change. And the form in which the contract was amended. But if that's really what happened, and then a fact finder, a board, is sitting down and saying, well, is this simply a voluntary cost accounting change of a little piece of a contract that's going to produce a higher cost? Or, because they would say that at one point, or instead is this the party sat down and re-looked the entire contract. And they came up, in essence, with a new contract that the board said was such that the cost bases that were in the new contract shall be treated as the cost that you use for pricing. Well, the most important piece of that picture that's missing was the board never made a finding that the additional $14.7 million was somehow agreed to between the parties. That the taxpayers would incur an additional $14.7 million on this contract solely by reason of Lockheed Martin's accounting changes. The board did make some findings, though. On page A16, the board said the parties were attempting to accurately determine the cost of the entire program and re-baseline the contract to ensure compliance with budgetary constraints. It goes on to say, we have found that the effects of the change practices were fully integrated and factored into the price of the entire contract as re-phased. But there's no finding that there was a meeting of the minds that the contract, that those additional costs would be incurred by the government. And in fact, the PCO who actually negotiated the changes lacks that authority. And we made that clear in our briefs. OK. There are no more questions. Thank you. We thank both counsel. The case is submitted. Could I just correct one thing on the record, sir? I said five days. The hearing lasted four days. Thank you. Thank you for the correction.